UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


WENDY JOHNSON,

        Plaintiff,

v.                                  Case No.: 8:08–cv–01279–T–24–TGW

JOHN E. POTTER,
*United States Postmaster General,*

        Defendant.
_____/

## ORDER GRANTING IN PART & DENYING IN PART SUMMARY JUDGMENT

The Court now considers the Motion for Summary Judgment filed by United States

Postmaster General John E. Potter, which Plaintiff Wendy Johnson opposes.  (Docs. 31, 45.)

### BACKGROUND[1]

In October 2004, Wendy Johnson, an African-American female, applied for a position

with the United States Postal Service in Lutz, Florida.  Branch Postmaster Shelah Marsh

interviewed Johnson for the job.  Soon after, Marsh hired Johnson as a temporary rural carrier, a

non-career position.[2]  Johnson worked in the Lutz branch for more than a year without incident.

---

[1] The Court includes this background only to provide context—not to make findings of fact.  Rule 56 requires that the Court view all facts and draw all reasonable inferences in the light most favorable to the non-moving party.  The Court has done this.

[2] Doc. 31-5; Marsh Decl. ¶5.  All of the jobs in the Lutz Post Office are considered rural carrier positions—as opposed to city carrier or clerk positions.  The rural carriers are divided into four categories. Temporary rural carriers and rural carrier associates hold non-career positions.  Part-time flexible rural carriers and full-time rural carriers hold career positions.  <u>Id.</u>

In fact, in March 2005, she was promoted to a rural carrier associate, also a non-career position.[3]

Beginning in January 2006, however, Johnson began experiencing problems on the job.

*Pre-EEO Complaint Incidents*

In January 2006, Johnson misplaced her identification badge and did not request a temporary badge while at work.  For this infraction, supervisor Judy Cardinal placed a warning letter in Johnson's file.[4]  The same month, Johnson did not call her supervisors by 3 p.m. to inform them that she would be late delivering the mail on her route.  Supervisor Jada Elliott requested a warning letter, but Johnson instead received an official discussion.  Elliott also conducted an "Investigative Interview" to determine why Johnson did not timely notify her that she needed longer to complete her route.[5]  Johnson committed the same infraction in May 2006, and Elliott again recommended a warning letter.[6]

Ten months passed without a problem.  Then in March 2007, Elliott informally spoke to Johnson about her absences.[7]  On May 19, 2007, Johnson left for her route early—before all the mail was ready to deliver.  Johnson went to lunch, leaving all the mail in her vehicle, and did not return to work for two hours even after Elliott told her to return to the Post Office immediately.[8]  Elliott wanted to fire Johnson for the offense,[9] but Marsh wrote Johnson a warning letter

---

[3] Doc. 31-5; Marsh Decl. ¶ 7.

[4] Doc. 31-6; Johnson Dep. at 115.  Doc. 31-1, Ex. 5.

[5] Doc. 31-1, Ex. 6.

[6] Doc. 31-1, Ex. 7.  The record is unclear whether Johnson actually received a warning letter.

[7] Doc. 31-6; Johnson Dep. at 125-27.  Doc. 31-1, Ex. 8.

[8] Doc. 31-1, Ex. 9.

[9] Doc. 31-5; Marsh Decl. ¶ 15.

instead.[10]

In August 2007, Johnson asked Marsh to appoint her to the Post Office Safety Committee, a position that allows carriers to earn extra pay.[11]  Marsh said she told Johnson that she would put her on the committee after Johnson took safety training classes and improved her performance.  Johnson recalls Marsh's response differently: Johnson said Marsh told her she had to wait for the open enrollment period.[12]

Between September 17 and 27, 2007, the Lutz Post Office conducted a special mail count to determine whether any of the existing part-time routes would turn into full-time routes.  At the end of the count, Marsh sent the data to the Postal Service's Suncoast District Operations Center, where officials who did not know Marsh reviewed the count and calculated the results.  Any route that took 39 hours or more per week to complete would convert into a full-time route, which resulted in the creation of a new full-time carrier position.  Pursuant to a collective bargaining agreement, Marsh had to fill each new full-time position based on seniority.[13]  At some point, Marsh told the three most senior carriers—including Johnson—that she expected that the Lutz Post Office would get three new full-time positions after the mail count.[14]  Johnson was the third most senior carrier on the list; the two more senior carriers were both white.

Before the mail count began, however, Johnson alleges that Marsh removed two busy

---

[10] Doc. 31-1, Ex. 9.  Around this same time, Johnson applied for a position as a road test examiner in a different branch of the Postal Service.  The hiring manager called Marsh for a recommendation.  Marsh did not recommend Johnson for the position, which Johnson did not get.  Doc. 31-5; Marsh Decl. ¶ 16.

[11] Doc. 31-5; Marsh Decl. ¶ 17.

[12] Doc. 47-1; Johnson Dep. at 231.

[13] Doc. 31-5; Marsh Decl. ¶¶ 3-4.

[14] Doc. 31-5; Marsh Decl. ¶ 21.

streets from one of the routes expected to bump up to full-time status.  Sebastein Figuero, one of

the three African-American carriers in the Lutz Post Office of about 75 employees, stated in an

affidavit that Marsh asked him to remove Lake Allen and Blount Roads from one of the routes

expected to go full-time.[15]  Figuero said he implemented the Route Adjustment Form signed by

Marsh before the mail count began on September 17, 2007.

On September 22, 2007, supervisors said Johnson left her shift without asking managers

whether they needed her to work extra hours.[16]  This time, Cardinal conducted an investigative

interview.  As a result of the infraction, Cardinal, with Marsh's approval, gave Johnson a seven-

day "time-off" suspension.[17]

### *Post-EEO Complaint Incidents*

On September 25, 2007, Johnson sought pre-complaint counseling from the Postal

Service's Equal Employment Opportunity Office ("EEO").[18]  She alleged that her supervisors

discriminated against her by disciplining her for leaving on September 22, 2007 while not

disciplining white postal carriers for similar behavior.  Johnson also alleged that supervisors

discriminated against her by giving other carriers more hours and more opportunities to advance.

Marsh learned about Johnson's EEO complaint sometime in October 2007.[19]   After

Marsh found out about the EEO Complaint, Johnson says things got progressively worse for her

---

[15] Doc. 48-1; Figuero Aff. ¶¶ 7-9.

[16] Doc. 31-5; Toler Decl. ¶¶ 2-4.

[17] Doc. 31-5; Marsh Decl. ¶ 9 ("Letters of warning and suspensions do not result in any loss of work time, pay, pay grade or benefits to the employee.").

[18] Doc. 31-1, Ex. 12 & 16.

[19] Doc. 15 ¶ 26 ("Admits that Ms. Marsh learned of plaintiff's EEO activity sometime in October 2007."). See also Doc. 31-5; Marsh Decl. ¶ 26.

at the Post Office.  On October 16, 2007, Johnson says Marsh called her into her office, where she found Marsh's supervisor, Mike Figley.  Marsh left the room, and Figley then questioned Johnson about her EEO complaint.[20]  Another supervisor, Delores "Dee" Knerr, gave Johnson a form to withdraw the EEO complaint.  Johnson refused to sign the withdrawal form.  However, as a result of the meeting, Marsh reduced Johnson's seven-day "time-off" suspension from the September 22, 2007 incident to an "official discussion."[21]  Marsh said she did so "in the spirit of compromise" and based on Johnson's agreement to improve.[22]

On October 17, 2007, Marsh told Johnson about the results of the mail count.  The mail count data had only yielded two new full-time positions—not three positions, as expected.  Based on seniority, the two new full-time positions would go to the two white carriers.  However, Marsh promoted Johnson to a career position as a part-time flexible rural carrier ("PTF").[23]  While not a full-time position, the PTF was still an advancement.[24]

On October 18, 2007, Johnson said she broke down crying at the office from all the stress.  She said she felt chest pains.  Johnson asked for and received leave.[25]  Marsh told Johnson that in order to return, Johnson would need a doctor's note saying that she was not a threat to herself or others.[26]  Marsh testified in her deposition that Postal Service policy required

---

[20] Doc. 31-3 at 82, Ex. 16.

[21] Doc. 31-5; Marsh Decl. ¶ 26.

[22] Id.

[23] Doc. 31-5; Marsh Decl. ¶¶ 21-22.

[24] Id.

[25] Doc. 31-3 at 84, Ex. 16.

[26] Doc. 31-1, Ex. 16.

the doctor's note to return to work.[27]

Both before and after she filed her EEO complaint, Johnson claims she did not receive extra hours as other employees did.  Working extra hours above the guaranteed minimum number allows a carrier to earn more money.  Even before the EEO complaint, Johnson complained that she did not get extra hours.  When Johnson first raised the issue of extra hours with Marsh, Johnson said Marsh responded that she knew Johnson was going to be trouble.[28] Another time, after Marsh heard that Johnson might file a union grievance over the issue, Marsh called Johnson into her office and reportedly said, "Do you think by you filing a grievance . . . it's going to . . . make me use you?"[29]  After the EEO complaint, Johnson said she received even fewer extra hours than she had before.

On November 5, 2007, Johnson said she was denied a chance to bid on different mail routes.[30]  (Marsh disputes this—she says she gave Johnson the best route after she could not reach her and then gave Johnson the chance to switch to a different route, if she preferred.)  A few days later, Johnson lost her arrow key—for the second time in two months.[31]  For losing her arrow key, Cardinal gave Johnson a warning letter.[32]

On Tuesday, January 22, 2008, Johnson did not show up for work.  Johnson had

---

[27] Doc. 46-1; Marsh Dep. at 137-38.

[28] Doc. 49-1; Johnson Decl. ¶ 6.

[29] Doc. 31-6 at 13 & 15; Johnson Dep. at 140-42.

[30] Doc. 31-1, Ex. 14 & Ex. 16 at 87.

[31] On October 13, 2007, Johnson lost her arrow key, but later found it on her route.  As a result, supervisor Delores "Dee" Knerr gave Johnson an official discussion.  Doc. 31-5; Knerr Decl. ¶ 2.

[32] Doc. 31-3, Ex. 32.

scheduled an appointment that day with a doctor and her attorney.  As a part-time flexible carrier, Johnson usually did not work Tuesdays, and she did not think she was scheduled to work.  However, Johnson had been scheduled to work, and had not checked the schedule board to notice this change.  As a result of missing work, Cardinal and Marsh gave Johnson a seven-day "time-off" suspension.[33]

In February and March 2008, Johnson also requested leave under the Family Medical Leave Act ("FMLA") to care for her daughter, who had a difficult pregnancy.  Marsh denied the request.[34]  Since Johnson's daughter was an adult, Johnson did not qualify for FMLA leave.  Johnson sought annual leave, but she was told she had none left and had to take unpaid leave to care for her daughter.  Johnson claims she had paid annual leave left.

In March 2008, Cardinal issued Johnson a warning letter for accumulating unscheduled absences on six days between December 14, 2007 and March 17, 2008.[35]  Also in March 2008, Knerr had an official discussion with Johnson for speaking on the phone with an EEO investigator at work.[36]  On March 28, 2008, Johnson received another warning letter for holding mail more than 10 days without delivering it.[37]

In May 2008, after two full-time carriers retired, Johnson was promoted to full-time status.[38]  Later that month, Johnson fell while delivering the mail, but did not report the injury

---

[33] Doc. 31-2, Ex. 21.

[34] Doc. 31-2, Ex. 24.

[35] Doc. 31-2, Ex. 25.

[36] Doc. 46-2; Knerr Dep. at 40-44.

[37] Doc. 31-3, Ex. 34.

[38] Doc. 31-5; Marsh Decl. ¶ 25.

immediately.  Johnson said she did not think she had been hurt.  When her knee began to swell about an hour after falling, she reported the injury.  For failing to report the injury immediately, supervisor Tammy Perez-Stigleman and Marsh gave Johnson a 14-day "time-out" suspension.[39] After her injury, Johnson was put on light duty and told to work in the front lobby of the Lutz Post Office.  Supervisors also bought Johnson a pillow to rest her leg, but the pillow contained pictures of monkeys—which Johnson considered to a racial slur directed at her. Carriers stated in affidavits that Marsh and other supervisors regularly spoke to Johnson in a disrespectful and demeaning tone.  While Johnson said no one ever uttered racial epithets in her presence,[40] Johnson testified that Marsh and other supervisors were cold and short with her.

In August 2008, Perez-Stigleman and Marsh gave Johnson another 14-day suspension for failing to notify management of the return of "Hot Case" mail that had to be delivered urgently.[41] During this time period, Johnson also asserted that the Postal Service paid her incorrect amounts, denied her extra hours, and made it administratively difficult for her to take leave.

After the EEO denied her claim of discrimination and retaliation, Johnson filed suit on July 3, 2008 in U.S. District Court.  Her Amended Complaint contains three counts.  Count I alleges discrimination under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, but does not specify whether the discrimination occurred through harassment or the creation of a hostile workplace, disparate treatment, or failure to promote.  Count II alleges retaliation under Title VII.  Count III alleges interference with her FMLA rights.

---

[39] Doc. 31-3, Ex. 35. <u>See</u> <u>also</u> Doc. 31-5; Perez-Stigleman Decl. ¶¶ 2-3.

[40] Doc. 31-6; Johnson Dep. at 71.

[41] Doc. 31-3, Ex. 36.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[42]  The Court must draw all inferences from the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts in that party's favor.[43]  Therefore, the moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Id.  When the moving party has discharged its burden, the non-moving party—in this case, Johnson—must then go beyond the pleadings, and by her own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue of material fact for trial.  Id.

The court "must avoid weighing conflicting evidence or making credibility determinations" at the summary judgment stage.  "It is not the role of the court to weigh the facts.  Rather the determination is of whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[44]

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[45]  In determining whether there is a

---

[42] Fed. R. Civ. P. 56(c).

[43] Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006).

[44] Hilburn v. Murata Elecs. N. Am., 181 F.3d 1220, 1225 (11th Cir. 1999) (internal quotations and citations omitted).

[45] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

"genuine" issue, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[46]  In addition, a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[47]  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. . . . The mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."[48]

Rule 56(e) of the Federal Rules of Civil Procedure also requires that any affidavit submitted on summary judgment "must be made on personal knowledge, state facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  The Court has reviewed the numerous affidavits submitted by postal carriers at the Lutz Post Office, and has disregarded those statements in the affidavits that would be inadmissible because they contain hearsay, make conclusory statements, assert facts without personal knowledge, or otherwise violate the Federal Rules of Evidence.

## ANALYSIS

### I.    Johnson's Claims Are Not Barred by Exhaustion Requirement

Before filing a Title VII action, a plaintiff first must file a charge with the EEOC, or in the case of the Postal Service, the EEO.[49]  The purpose of this requirement "is that the [EEO] should have the first opportunity to investigate the alleged discriminatory practices to permit it to

---

[46] Id. at 251-52.

[47] Id. at 248.

[48] Id. at 249-50, 252.

[49] Sanchez v. Standard Brands, Inc., 431 F.2d 455, 460 (5th Cir.1970).

perform its role in obtaining voluntary compliance and promoting conciliation efforts."[50]  In

Gregory v. Georgia Department of Human Resources, the Eleventh Circuit held that a

"plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can

reasonably be expected to grow out of the charge of discrimination."[51]  Because courts should be

"extremely reluctant to allow procedural technicalities to bar claims . . . the scope of an EEOC

complaint should not be strictly interpreted."[52]  Judicial claims are allowed if they "amplify,

clarify, or more clearly focus" the allegations in the EEOC complaint, but not if they allege new

acts of discrimination."[53]

        The Postmaster General asserts that two incidents in Johnson's lawsuit should be barred

because she did not exhaust her administrative remedies at the EEO level before filing suit.  The

incidents include that (1) Johnson was not allowed to work extra hours as a rural carrier

associate, and (2) that in October 2007, Marsh required Johnson to obtain a doctor's note saying

she was not a threat to herself or others before Johnson could return to work.  As the basis for

this assertion, the Postmaster General states that the EEO did not include these two incidents in a

December 18, 2007 letter of partial acceptance/partial dismissal of Johnson's formal EEO

complaint.[54]  Johnson did not object to this omission.

        The EEO's failure to include these two incidents in the December 18, 2007 letter does

not bar Johnson from raising the claims now.  First, the December 18, 2007 EEO letter said that

---

[50] Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1279-80 (11th Cir. 2004).

[51] Id. (internal citations omitted).

[52] Id.

[53] Id.

[54] Doc. 31-4 at 26, Ex. 14.

its investigation was "not limited to" the listed incidents.  Johnson had every reason to take the

EEO at its word.  She could safely assume that the listed incidents were the major incidents

being investigated, but not the only ones.  Second, the Postmaster General is not correct that

Johnson did not include the two incidents at issue in her EEO complaints.  On October 30, 2007,

Johnson complained about the doctor's note demand in a letter to the EEO.[55]  Johnson also

complained about the lack of extra hours she received as a rural carrier associate in a pre-

complaint counseling form submitted to the EEO,[56] and also mentioned the issue, albeit in

passing, in another letter to the EEO.[57]  Johnson clearly intended these letters to serve as part of

her EEO complaint, either as updates or amendments.  Even if these letters did not strictly

comply with the Postal Service's complaint procedures, it is undisputed that Johnson put the

Postal Service on notice of these incidents.  Courts should be "extremely reluctant to allow

procedural technicalities to bar claims."[58]  Therefore, Johnson should not be barred from raising

these two incidents now because the EEO failed to incorporate them into a summary of her

allegations.

## II.     Johnson Did Not Abandon Claims By Failing to Plead Every Factual Basis in the Amended Complaint

The Postmaster General also seeks to bar, as abandoned, any claim that stems from six

incidents not specifically described in Johnson's Amended Complaint.  The Postmaster General

---

[55] Doc. 31-1 at 79, Ex. 16.

[56] Doc. 31-1 at 64, Ex. 12.

[57] Doc. 31-1 at 81, Ex. 16.  While the letter is not dated, it must have been sent after October 16, 2007 because the letter mentions events that occurred on that date.  The letter says in relevant part: "In June 2007, Ms. Marsh stated that she will not be using me for any extra work for at least 6-8 months because of a write up I received in May 2007."  Id.

[58] Gregory v. Ga. Dep't of Human Resources, 355 F.3d 1277, 1279-80 (internal citations omitted).

acknowledges that Johnson included these six incidents in her EEO complaint, but failed to enumerate them in her Amended Complaint.  The six incidents include: (1) the 14-day suspension in March 2008 for failing to deliver mail for more than 10 days; (2) the 14-day suspension in June 2008 for failing to immediately report her injury from an accident; (3) the 14-day suspension in September 2008 for failing to notify management of the return of urgent "Hot Case" mail; (4) the Postal Service's failure to correctly pay for a work injury; (5) the Postal Service's failure to correctly pay her for delivering "Hot Case" mail; and (6) the Postal Service's action that allegedly denied her an opportunity to bid on different routes in November 2007.

Rule 8 of the Federal Rules of Civil Procedure requires a plaintiff to make a "short and plain statement" of her claims.  The purpose is to provide the defendant with notice of the claims against them.[59]  A plaintiff need not describe every factual detail that supports her complaint so long as she pleads sufficient factual information to provide notice of a plausible claim.[60]  Rule 15 also provides that a court "should freely give leave" for a party to amend the pleadings "when justice so requires."[61]

The Postmaster General relies on Cooper v. Southern Co., in which the Eleventh Circuit upheld summary judgment against a plaintiff who failed to include denial of a specific job as part of the factual basis for a discrimination claim.[62]  In ruling on a discrimination claim, the Eleventh Circuit said that the plaintiff's failure to list a specific job denial in the complaint was fatal.

---

[59] Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Fed. R. Civ. P. 8(a)(2).

[60] Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

[61] Fed. R. Civ. P. 15(a).

[62] Cooper v. Southern Co., 390 F.3d 695, 732 (11th Cir. 2004), overturned on other grounds, Ash v. Tyson Foods, Inc., 546 U.S. 454 (2006).

"Any claims not asserted in the plaintiff's Complaint are properly dismissed."[63] In <u>Coon v. Georgia Pacific Corp.</u>, the Eleventh Circuit said that even the mention of discriminatory incidents in pre-trial motions and discovery "were not a substitute for the factual allegations of a complaint under Federal Rule of Civil Procedure 8(a)."[64] A defendant cannot be expected to guess at the scope of a plaintiff's claim. When Johnson failed to include these six incidents in the Amended Complaint, the Postmaster General may have properly concluded that Johnson had dropped the claims in order to limit the lawsuit.

On the other hand, equity counsels against the harsh result that the Postmaster General seeks. The Postmaster General is not prejudiced by the pleading deficiencies. Both sides explored these incidents extensively in discovery. The Postmaster General knew about the incidents from the outset and, based on his motion, realized during discovery that Johnson planned to use the incidents as evidence of discrimination and retaliation. Moreover, this is not a case where the plaintiff raised entirely new theories or claims in response to summary judgment.[65] Instead, the Postmaster General in his summary judgment motion realized that Johnson had omitted several incidents that may form part of the lengthy factual basis for the existing claims. Since Rule 15 instructs courts to freely grant leave to amend pleadings to conform to the evidence, the Court on its own will allow Johnson to amend her pleading to include these incidents. Failure to do so will result in the claims being barred.

---

[63] <u>Id.</u>

[64] <u>Coon v. Ga. Pac. Co.</u>, 829 F.2d 1563, 1568 (11th Cir. 1987).

[65] <u>See</u> <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312 (11th Cir. 2004) ("Efficiency and judicial economy require that the liberal pleading standards under <u>Swierkiewicz</u> and Rule 8(a) are inapplicable after discovery has commenced. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).").

III.    <u>Count I</u>: **Part of Johnson's Discrimination Claim Survives Summary Judgment**

    A.    <u>Hostile Workplace Claim</u>:  **Johnson Has Not Offered Sufficient Evidence to Support a Hostile Workplace Claim**

Although it is not clear that Johnson pleaded a hostile workplace claim under Count I of the Amended Complaint, the Court will address the claim since both parties raise it.  A plaintiff establishes a hostile workplace claim under Title VII when she proves that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[66]  In evaluating allegedly discriminatory conduct, the Eleventh Circuit considers the harassment's (1) frequency; (2) severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.[67]  "Moreover, the plaintiff must prove that the environment was both subjectively and objectively hostile. . . . The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable."[68]

Even when viewing the evidence in the light most favorable to Johnson and drawing every reasonable inference in her favor, Johnson's evidence of mistreatment does not rise to the

---

[66] <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (quotations and citations omitted).  Johnson must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic; (4) that the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability. <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002).

[67] <u>Reeves v. C.H. Robinson Worldwide, Inc.</u>, 594 F.3d 798, 808-09 (11th Cir. 2010) (en banc) (internal citations and quotations omitted).

[68] <u>Id.</u>

level of "severe and pervasive" harassment that creates "an abusive working environment."  At best, Johnson has offered evidence that her supervisors treated her rudely, regularly talked down to her, unfairly disciplined her, denied her extra hours above her guaranteed minimum hours, and made it administratively difficult for her to obtain leave and the correct pay.  In addition, Johnson testified she felt humiliated when, after a leg injury, managers gave her a pillow to rest her leg that contained pictures of monkeys.  While the Court understands that Johnson interpreted the monkeys on the pillow to be offensive, the Court must evaluate whether "objectively" a person would consider the pillow to amount to a racial slur so outrageous that it altered the conditions of the workplace.  The monkeys on the pillow send an ambiguous message that might offend some people, but not others.  The monkeys on the pillow are not the type of hate symbol, such as a swastika or noose, that clearly conveys a message of terror.  Thus, the Court does not find that this incident, even considered in combination with the other incidents, could be considered as a matter of law to create "severe and pervasive" harassment that "alter[s] the conditions of the victim's employment and create an abusive working environment."[69] Therefore, any harassment or hostile workplace claim does not survive summary judgment.

### B.    <u>Disparate Treatment Claims</u>: Part of Johnson's Claim Survives Summary Judgment

"In a disparate treatment case, the plaintiff bears the burden of proving that the employer intentionally discriminated against him because of her race.  The plaintiff can establish discriminatory intent through either direct or indirect evidence;[70] to establish a prima facie case

---

[69] <u>Harris</u>, 510 U.S. at 21 (quotations and citations omitted).

[70] No direct evidence exists in this case.  <u>See</u> <u>Cooper v. Southern Co.</u>, 390 F.3d 695, 723 n.15 (11th Cir. 2004), <u>overturned on other grounds</u>, <u>Ash v. Tyson Foods, Inc.</u>, 546 U.S. 454 (2006) ("Direct evidence is evidence which itself proves the existence of discrimination and does not require inference or interpretation, as for example a

of intentional discrimination using circumstantial evidence, plaintiffs may use the framework established in <u>McDonnell Douglas Corp. v. Green</u>. . . ."[71]

"In a discrimination action brought under either Title VII or Section 1981, a plaintiff must first establish a prima facie case of discrimination, which the defendant can rebut by offering a legitimate, non-discriminatory reason for the allegedly discriminatory act. . . . [T]he defendant's burden of rebuttal is exceedingly light. . . . At this stage of the inquiry, the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof."[72]

"If the defendant successfully rebuts the plaintiff's prima facie case, the presumption of discrimination is eliminated.  To survive summary judgment, the plaintiff must then come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.  To show that the employer's reasons were pretextual, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence."[73]

### 1.    Disparate Discipline Claim

---

frank admission from a manager that he refused to hire an applicant because he was black or because she was female.").

[71] <u>Cooper</u>, 390 F.3d at 723-24.

[72] <u>Cooper</u>, 390 F.3d at 724-25 (internal citations and quotations omitted).

[73] <u>Cooper</u>, 390 F.3d at 725 (internal citations and quotations omitted).

In her Amended Complaint, Johnson asserts that one standard of discipline applied to her because she is African-American and another standard applied to white employees.  To establish a prima facie case of discrimination, Johnson must show: (1) she is a member of a group protected by Title VII; (2) she was qualified for the position or benefit sought; (3) she suffered an adverse effect on her employment; and (4) she suffered from a differential application of work or disciplinary rules.[74]

Johnson's disparate discipline claim fails because she cannot show that any of the discipline amounted to an "adverse action," as that term is defined by law.  The Eleventh Circuit has repeatedly said that "[n]ot all discipline is actionable as a matter of law."[75]  Instead, "the employee challenging the acts must demonstrate serious and material change in the terms, conditions, or privileges of their employment."[76]  The action must overcome some "threshold level of substantiality."[77]

In Clark v. Potter, another discrimination case against the Postal Service, the Eleventh Circuit found that the Postal Service's warning letters did not constitute "adverse action."[78]  In Clark, as in this case, the "letter had no effect on [the plaintiff's] employment.  [The plaintiff] admitted that she did not lose pay or suffer a loss of grade or employment benefits as a result of such disciplinary action.  [The plaintiff did] not allege that the letter had any other tangible job

---

[74] Spivey v. Beverly Enters., Inc., 196 F.3d 1309, 1312 (11th Cir. 1999).

[75] Davis v. Town of Lake Park, 245 F.3d 1232, 1238-39 (11th Cir. 2001).

[76] Davis, 245 F.3d at 1238-39.

[77] Davis, 245 F.3d at 1239.

[78] Clark v. Potter, 232 F. App'x 895, 897 (11th Cir. 2007).

effects, nor is there any such evidence."[79]  Here, it is undisputed that the warning letters and

suspensions did not alter Johnson's pay, pay grade, or benefits.  Nor did the warning letters or

suspensions change Johnson's employment in a "serious and material" way.  As a result of the

"time out" suspensions and warning letters, Johnson did not lose pay and did not lose benefits.

The disciplinary "write-ups" were not permanent.  Johnson's warning letters and suspensions

would drop out of her personnel file within one year and two years, respectively, unless Johnson

received additional discipline during this period.[80]  Because the suspensions and warning letters

did not affect Johnson's pay or employment conditions, the discipline does not constitute an

adverse employment action for purposes of a Title VII discrimination claim.  Therefore, Johnson

cannot make a prima facie case of disparate discipline.[81]

### 2.       Disparate Award of Extra Hours & Additional Pay

Johnson also alleges that the Postal Service discriminated against her by not allowing her

to work extra hours to earn extra pay.  Johnson claims that the Postal Service permitted

similarly-situated white carriers to work extra hours.  It is undisputed that the Postal Service was

not required to let Johnson or any other carrier work extra hours.  As a part-time carrier, Johnson

was only guaranteed a minimum amount of hours.  While giving a carrier extra hours did not

amount to a "promotion," the extra hours allowed the carrier to earn more money.  For this

reason, the Court will analyze this claim under the analogous framework set out for failure to

promote claims.  Under McDonnell Douglas, a plaintiff may establish a prima facie case of

---

[79] Id.

[80] Doc. 46-2, Ex. G; Stanton Dep. at 148.

[81] There may be additional grounds to grant the Postmaster General summary judgment on Johnson's
disparate discipline claim.  However, since one ground is sufficient, the Court will not rule on the other grounds.

discrimination in promotion by showing that "(1) she belongs to a racial minority; (2) she was qualified for and applied for a position the employer was trying to fill; (3) she was denied the position; and (4) others who were not members of the protected class were hired" or, in this case, given extra work hours.[82]

No dispute exists that Johnson can make out the elements of this prima facie case, and that the Postal Service has offered a legitimate, non-discriminatory reason for its failure to award Johnson extra hours.  Marsh and other supervisors testified that they did not give Johnson extra hours to avoid paying excessive overtime.[83]  Extra duties went to the first carriers who completed their routes.  Because Johnson took longer to complete her route and "struggled to deliver her [regular mail] within the evaluated time," she did not get as many extra hours as carriers who worked faster.[84]

As evidence of pretext, Johnson produced time records for herself and three white carriers.  Johnson's analysis of the records shows that the other white carriers received more extra hours between May 2007 and March 2008, even though in many months, Johnson completed her route quicker than they did.[85]  This data satisfies Johnson's burden to produce evidence of pretext such that a reasonable jury might disbelieve the Postmaster General's non-discriminatory reason for the actions.  Therefore, a genuine issue of material fact exists for a jury to decide whether the Postal Service denied Johnson additional hours and extra pay for discriminatory or legitimate reasons.

---

[82] Cooper, 390 F.3d at 724 n.16.

[83] Doc. 31-6; Elliott Dep. at 156.  Doc. 31-6; Knerr Dep. at 49.

[84] Doc. 31-5; Marsh Decl. ¶ 32.

[85] Doc. 59-1, Ex. 1 & 2.

### 3.     Failure to Create Full-Time Position in Mail Count

Johnson also alleges that the Postal Service denied her the opportunity to become a full-time carrier quicker by sabotaging the September 2007 mail count for discriminatory reasons. Johnson alleges that before the mail count began, Marsh removed streets from one of the routes, resulting in the creation of two, rather than three, full-time positions.  The two new positions went to white carriers as a result of seniority.  The third position, which Johnson would have automatically filled by virtue of seniority, was not created.  Consequently, Johnson was not promoted to full-time status for another eight months.

Johnson's claim does not squarely fit into the failure to promote rubric since Marsh's alleged actions resulted in no one being promoted to a position that did not exist.  "Failure to promote is generally an adverse action but not if there is no open position."[86]  However, "[i]t is well-settled that the prima facie case method established in <u>McDonnell Douglas</u> was 'never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'"[87]  Therefore, while recognizing that the allegation does not fall perfectly into a failure to promote framework, the Court nevertheless draws upon this analogous framework to guide its analysis.

Under Johnson's theory, the discriminatory act at issue here was Marsh's alleged decision in September 2007 to take two streets out of Route 50 and assign them to another route, resulting in the creation of two, rather than three, new full-time positions.  Johnson has presented

---

[86] <u>Guimaraes v. Nors</u>, No. 07-20592-CIV, 2009 WL 1098092, at *5 (S.D. Fla. Apr. 22, 2009).

[87] <u>U.S. Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 715 (1983).

evidence that Marsh instructed that two streets be removed from Route 50.[88]  Marsh did not deny

this allegation.

The Postmaster General moves for summary judgment on this claim based on a single

argument: that Johnson was not treated differently than another, white employee ranked fourth in

seniority who also was not promoted to a position that was not created.  This argument does little

to advance the Postmaster General's position, and misses the mark of Johnson's claim.  Johnson

did not present evidence that Marsh removed streets from *two* routes.  She presented evidence

only that Marsh targeted her by removing streets from one route, resulting in the loss of one full-

time job that would have gone to Johnson.  The Postmaster General offers no other basis to grant

summary judgment.  Moreover, the Postmaster General offers no legitimate reason why Marsh

removed these streets from the route.  Accordingly, since material facts remain in dispute,

summary judgment must be denied on this claim.

## IV.   Count II: Genuine Dispute of Material Facts Remains on Retaliation Claim

In order to prove retaliation under Title VII, a "plaintiff must show that (1) she engaged

in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse

action was causally related to the plaintiff's protected activities."[89]  The parties do not dispute

---

[88] In an affidavit, carrier Sebastein Figuero said that Marsh "filled out a Route Adjustment form and asked me to make the change by eliminating Lake Allen and Blount Roads from the 'line of travel.'" Doc. 48-1, Ex. G ¶ 8. In another affidavit, carrier Shelba Christian said Lake Ellen [sic] and Blount Roads were transferred from Route 50 to Route 47, which was "very unusual because Lake Ellen [sic] and Blount were not even in the same zip code as Route 47." Doc. 48-1, Ex. K ¶¶ 10-14.
In her deposition, Marsh was asked whether she moved Geraci and Blout Roads before the mail count.  "I don't definitely remember," Marsh testified.  "It probably was."  Doc. 46-1; Marsh Dep. at 124-25.

[89] Little v. United Techs, Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir.1997).

that Johnson engaged in statutorily protected activity by filing an EEO complaint.[90]

### 1.     Adverse Action for Retaliation Claims

Although the Eleventh Circuit used to apply the same definition of an "adverse action" for both discrimination and retaliation claims under Title VII, that practice changed when the U.S. Supreme Court in Burlington Northern & Sante Fe Railway Co. v. White announced a different standard for adverse actions in retaliation claims.[91]  In Burlington Northern, the Supreme Court made clear that the retaliation provisions of Title VII are "not limited to discriminatory actions that affect the terms and conditions of employment."[92]  A retaliatory adverse action is any action which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[93]  The adverse action, however, must be materially adverse.  The harm must be "significant," as opposed to "trivial."  "[N]ormally petty slights, minor annoyances, and simple lack of good manners" do not deter a reasonable worker from pursuing a discrimination charge under Title VII.[94]  The Supreme Court in Burlington Northern emphasized that "[c]ontext matters."  It explained:

---

[90] "The filing of an EEOC claim is a 'statutorily protected activity.'" Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008).

[91] 548 U.S. 53, 63-70 (2006).  See also Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998); Grimsley v. Marshalls of MA, Inc., 284 F. App'x 604, 608 n.5 (11th Cir. 2008).
In Grimsley, the Eleventh Circuit said, "We reject [the] argument that the decision in Burlington Northern & Santa Fe Railway Co. v. White applies to claims of disparate treatment discrimination.  The 'materially adverse' standard in Burlington Northern was explicitly limited to claims brought under Title VII's anti-retaliation provision, and the Supreme Court was careful to note that a different standard applied to substantive claims of discrimination." Id. (internal citations omitted).

[92] Burlington Northern & Sante Fe Railway Co. v. White, 548 U.S. 53, 64 (2006).  The Eleventh Circuit has described the retaliation standard as a "more liberal view" protecting "a wider range of retaliatory conduct" than the standard that the Eleventh Circuit previously used.  Crawford v. Carroll, 529 F.3d 961, 974 (11th Cir. 2008).

[93] Burlington Northern, 548 U.S. at 68.

[94] Id.

A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.  A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.[95]

The Eleventh Circuit has said that <u>Burlington Northern</u> "strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered materially adverse to him and thus constitute adverse employment actions" within a retaliation claim.[96]

The Postmaster General argues that the various disciplinary actions taken against Johnson after her initial EEO complaint cannot constitute adverse retaliatory actions because they did not, in fact, deter Johnson from pursuing her EEO complaint.  After each of these actions, Johnson updated or amended her EEO complaint.  The Postmaster General's argument, however, applies the wrong legal standard to this issue.  The Court must apply an "objective standard" to the question of whether an action would deter a "reasonable" worker in Johnson's position from pursing a discrimination complaint.[97]  While the fact that Johnson persisted with her claim "may shed light as to whether the actions are sufficiently material and adverse to be actionable,"[98] Johnson's subjective response does not control the question.  Given the nature of the alleged retaliatory actions, which included the denial of extra pay, and viewing the evidence

---

[95] <u>Id.</u> at 69.

[96] <u>Crawford</u>, 529 F.3d at  973 n.13.

[97] <u>Burlington Northern</u>, 548 U.S. at 68-69.

[98] <u>Burgos v. Napolitano</u>, 330 F. App'x 187, 190 (11th Cir. 2009) (quoting <u>Somoza v. Univ. of Denver</u>, 513 F.3d 1206, 1214 (10th Cir. 2008)).

in the light most favorable to Johnson, the Court finds a jury question exists on whether the Postal Service took adverse retaliatory actions against Johnson.

### 2.      Causal Connection Between Protected Activity and Adverse Action

The Postmaster General first argues that there can be no causal link between Johnson's EEO complaint and the disciplinary action taken against her because some of the supervisors working under Marsh did not know about Johnson's EEO complaint until after they disciplined her.  But exactly when Marsh and Cardinal learned of Johnson's EEO activity is itself in dispute. Furthermore, there remains a genuine issue of material fact about whether the supervisors acted independently to discipline Johnson and deny her extra hours, or whether the supervisors acted in concert with Marsh or at Marsh's direction.  The record contains testimony supporting both positions.  Therefore, this factual issue turns on witnesses' credibility, which makes summary judgment unsuitable.

The Postmaster General also argues that no "close temporal proximity" exists between Johnson's first EEO complaint in October 2007 and the allegedly retaliatory acts that began the same month and continued through 2008.  Viewing the facts in the light most favorable to Johnson, Johnson's protected activity includes not just the filing of her initial complaint, but also the subsequent amendments or "updates" that Johnson provided the EEO as each new allegedly retaliatory activity occurred.  Johnson filed an informal EEO complaint on or around October 5, 2007[99] and a formal EEO complaint on October 20, 2007.[100]  Johnson sent the EEO letters on

---

[99] The exact date is not clear in the record.

[100] Doc. 31-1, Ex. 12 & 16.  In her response, Johnson states that her formal EEO Complaint was filed November 1, 2007.  But one of the signed dates on the formal Complaint is October 20, 2007.  Based on the evidence before the Court, the exact date is unclear.

October 30, 2007, November 6, 2007, and December 5, 2007 that updated or amended her complaint with new allegations.[101]   Around May 10, 2008,[102] Johnson filed a second EEO complaint, and updated it with new allegations on September 24, 2008.[103]   During this time period, Johnson alleges that different supervisors retaliated against her through (1) unfair disciplinary actions; (2) unfair denial of extra hours; (3) consistently rude behavior, including giving her the "monkey pillows"; and (4) by interfering with the EEO process.   Specifically, Johnson alleges retaliatory discipline occurred around October 18, 2007, when Marsh ordered her to get the doctor's note to return.[104]   Johnson also alleges retaliation in early November 2007 when Johnson received a warning letter for losing her arrow key, and on January 22, 2008, when she received a seven-day time-off suspension for not showing up for work after the Dr. Martin Luther King Jr. federal holiday.   In addition, Marsh received an "official discussion" after speaking in March 2008 on the phone while at work to an EEO official.   Johnson offers evidence that throughout this time period, supervisors did not assign her as many extra hours and treated her with disrespect.   Viewing the evidence in the light most favorable to Johnson, the Court finds that a jury question remains whether a causal link exists between the Postal Service's actions and Johnson's EEO activity.

### 3.   McDonnell Douglas Burden Shifting

Because Johnson alleges a retaliation claim based on circumstantial evidence, the burden

---

[101] Doc. 31-1, Ex. 16.  Doc. 31-2, Ex. 18.

[102] The exact date is not clear in the record.

[103] Doc. 31-2, Ex. 29.  Doc. 31-4, Ex. 30.

[104] Doc. 31-1, Ex. 16.

shifting framework in <u>McDonnell Douglas</u> applies.[105]  Since Johnson has presented enough

evidence to create a jury question to establish a prima facie case, the burden shifts to the

Postmaster General to articulate a legitimate reason for the Postal Service's actions.  The

Postmaster General can meet this burden.  He can show that supervisors disciplined Johnson

because she failed to follow procedure and performed poorly on the job.  He can show that

Johnson's supervisors did not give her extra work because it would have cost too much overtime.

Therefore, Johnson must produce evidence that the Postmaster General's reasons are

pretext for retaliation.[106]  Johnson "must meet the reason proffered head on and rebut it."[107]  Her

burden, however, is to produce evidence, not to persuade the Court that her evidence definitely

establishes pretext.[108]

By showing that other carriers were assigned extra hours, even though they delivered the

mail slower than Johnson did, Johnson produced evidence that the Postmaster General's

financial reasons for the supervisor's assignment of extra hours could be pretext for a retaliatory

motive.

As for Johnson's discipline, Johnson produced evidence of pretext by submitting

affidavits to show that supervisors did not discipline other carriers who had not filed EEO

complaints for committing similar infractions.  For instance, Johnson produced an affidavit from

---

[105] <u>Beard v. 84 Lumber Co.</u>, 206 F. App'x 852, 858-59 (11th Cir. 2006).

[106] <u>Id.</u>

[107] <u>Crawford v. City of Fairburn</u>, 482 F.3d 1305, 1308 (11th Cir. 2007).

[108] As the Eleventh Circuit has said, "The burden to avoid summary judgment is not to show by a preponderance of the evidence that the reasons stated were pretext.  Rather, plaintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of facts, which when taken in the light most favorable to the non-moving party, could allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext."  <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 921 (11th Cir. 1993).

carrier Shelba Christian, who requested a leave for stress in November 2007, about a month after Johnson requested the leave.[109]  While Marsh required that Johnson obtain a letter from her doctor stating that she was not a threat, Marsh did not demand that Christian obtain the same type of letter.[110]  Johnson also produced an affidavit from carrier Bruce McKenney.  McKenney stated that he was not disciplined for failing to immediately report an on-the-job injury, even though he waited six hours to tell his supervisors about the injury.[111]  By contrast, Johnson received a 14-day suspension in May 2009 for waiting one hour to report her injury.  McKenney also stated in his affidavit that he lost his arrow key, but supervisor Jada Elliott told him "not to worry."  He was not disciplined.[112]  By contrast, Johnson lost her arrow key on October 13, 2007, shortly after she filed her informal EEO complaint.  Two months later on December 14, 2007, after converting her informal EEO complaint into a formal complaint, Cardinal gave Johnson a warning letter for losing her arrow key.

The Eleventh Circuit has "made clear that, when a plaintiff seeks to point out a workplace comparator who was treated less severely than the plaintiff, the 'quantity and the quality of the comparator's misconduct [must be] nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'"[113]

_____

[109] At the time that Christian requested leave for stress, she had not filed an EEO complaint.  But she did so in June 2009.  Doc. 48-1, Ex. K.  Christian Aff. ¶ 20.

[110] Doc. 48-1, Ex. K.  Christian Aff. ¶¶ 4-5.

[111] Doc. 48-1, Ex. C.  McKenney Aff. ¶¶ 14-25.  McKenney filed a supplemental affidavit stating that he had never filed an EEO complaint.  Doc. 48-1, Ex. J.

[112] Doc. 48-1, Ex. C.  McKenney Aff. ¶¶ 26-30.  The record is unclear if Elliott acted alone, or consulted Marsh when deciding not to discipline McKenney.  Cardinal—not Elliott—disciplined Johnson for losing her arrow key.

[113] Hankins v. AirTran Airways, Inc., 237 F. App'x 513, 522-34 (11th Cir. 2007) (quoting Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999)).

Therefore, a jury would have to find whether the other carriers' conduct was "nearly identical" to Johnson's.  Also, a jury would have to consider (except as to the doctor's note) whether the other carriers had nearly identical disciplinary records as Johnson.  Since the Postal Service operates on a progressive discipline system, where discipline increases based on the nature and number of an employee's past infractions, two employees who committed the same misconduct might not receive the same punishment if they had different disciplinary records.

However, to survive summary judgment, Johnson must merely produce evidence from which a reasonable jury could find pretext.  Viewing the evidence in the light most favorable to Johnson, the Court finds that Johnson has met this burden.

## V.    <u>Count III</u>: Without Evidence of Damages, Johnson's FMLA Claim Fails

The Postmaster General moves for summary judgment on Count III, which alleges interference with Johnson's rights under the Family Medical Leave Act ("FMLA"), because Johnson acknowledges that she suffered no damages as a result of the alleged violations.  In her answers to interrogatories, Johnson stated that she did not lose any income or incur any expenses as a result of the Postal Service's denial of her FMLA leave request.  Moreover, in her response, Johnson does not address the Postmaster General's argument as to Count III.  Having failed to respond to this argument, Johnson apparently does not oppose summary judgment on Count III.

Even if Johnson had opposed the motion, the Court must grant the Postmaster General summary judgment on Count III.  The FMLA "provides no relief unless the employee has been prejudiced by the violation" in some way.[114]  Johnson may not recover for "technical infractions

---

[114] <u>Demers v. Adams Homes of N.W. Fla., Inc.</u>, 321 F. App'x 847, 849 (11th Cir. 2009) (citing <u>Ragsdale v. Wolverine World Wide, Inc.</u>, 535 U.S. 81, 89 (2002)).

under the FMLA . . . in the absence of damages."[115]  Since Johnson does not claim economic

damages, and because the FMLA does not provide for nominal damages or emotional distress

damages,[116] Johnson's FMLA claim cannot succeed.  Therefore, the Postmaster General is

entitled to summary judgment on Count III of the Amended Complaint.

## CONCLUSION

The Postmaster General's Motion for Summary Judgment (Doc. 31) is **GRANTED IN**

**PART AND DENIED IN PART** as follows:

(1)    As to Count I, the discrimination claim, summary judgment is **GRANTED IN**

**PART** and **DENIED IN PART** as described in this Order.

(2)    As to Count II, the retaliation claim, summary judgment is **DENIED**.

(3)    As to Count III, the FMLA claim, summary judgment is **GRANTED** in favor of

the Defendant, United States Postmaster General John E. Potter, and against the

Plaintiff, Wendy Johnson.

**IT IS SO ORDERED**.

*Done on August 10, 2010.*

SUSAN C. BUCKLEW
United States District Judge

---

[115] Id. (citing Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1284 (11th Cir.1999)).

[116] 29 U.S.C. § 2617(a)(1); Andrews v. CSX Transp., Inc., 3:06-cv-704-J-32-HTS, 2009 WL 5176462, at *2 & n.6 (M.D. Fla. Dec. 22, 2009).